**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| FRANCES V. GAIK and CASEY GAIK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 05 C 2335 |
| ) | |
| OAK BROOK VILLAGE PROSECUTOR ) | Judge Rebecca R. Pallmeyer |
| JOAN E. MULLINS, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

In this civil action, Plaintiffs Dr. Francis V. Gaik ("Dr. Gaik") and her husband Casey Gaik ("Mr. Gaik") ("Plaintiffs") allege that Defendant Joan E. Mullins ("Defendant"), a former village prosecutor for the village of Oak Brook, Illinois, maliciously prosecuted Plaintiff Casey Gaik and denied both Plaintiffs' civil rights in violation of 42 U.S.C. § 1983. (Am. Compl. [117] at 13-15.) Following a five-day jury trial, the jury found Defendant not liable on each of Plaintiffs' three claims: an Illinois state law claim alleging malicious prosecution; a 42 U.S.C. § 1983 claim alleging that Defendant deprived Plaintiffs of their freedom of speech; and a 42 U.S.C. § 1983 claim alleging that Defendant deprived Plaintiffs of equal protection of the law. (Trial Tr. vol. 5, 923:1-23.) Plaintiffs now move for a new trial, arguing that misconduct on the part of Defendant's counsel prejudiced Plaintiffs' case and entitles them to a new trial. (Pl.'s Mot. for a New Trial [202] (hereinafter "Pl.'s Mot.") at 1.) As Defendant points out in her response, Plaintiffs do not argue that the verdict is unsupported by the evidence. (Def.'s Response to Pl.'s Mot. for a New Trial [225] (hereinafter "Def.'s Resp.") at 1.) For the reasons stated below, the court finds that Defendant committed no misconduct or misstatement resulting in prejudice. Plaintiffs' motion for a new trial is therefore denied.

## FACTUAL BACKGROUND

This action stemmed from a dispute beginning in 2005 between Plaintiffs, former residents

of Oak Brook who became vocal critics of the local government and police force, and Defendant, the Oak Brook village prosecutor. (Trial Tr. vol. 1, 8:1-7.) Before becoming village prosecutor, Defendant had worked for the DuPage County state's attorney's office. As village prosecutor, she was responsible to prosecute misdemeanors, traffic violations, and infractions of village code. (*Id.* vol. 2, 303:15-18.) In 2004, Dr. Gaik was president of a concerned citizens' group called "Oak Brook Citizens for Better Government." (*Id.* at 11:3-7). Dr. Gaik testified that in December of 2004 she received an anonymous note in the mail informing her that "[t]he village prosecutor received a ticket for leaving the scene of an accident." (*Id.* vol. 4, 702:14-15.) A few weeks later, on February 8, 2005, Dr. Gaik made public comments at a village meeting in which she criticized village officials, specifically mentioning Defendant's auto accident. (*Id.* at 703:13.) Soon after that, Dr. Gaik also made statements to a newspaper reporter who had heard Dr. Gaik's public comments and had begun investigating Defendant's accident for a story to be published in the Oak Brook *Daily Herald* on February 10th. (*Id.* at 705:1-7.) Apart from these comments, Dr. Gaik asserted, she has never "attacked" Defendant or Defendant's family, nor has she made comments about any of Defendant's family members. (*Id.* at 706:21-707:19.)

On February 11, the day after the *Daily Herald* story appeared, Plaintiffs, Defendant, and other village officials began receiving e-mails mocking or questioning Dr. Gaik and Mr. Gaik's credibility. (*Id.* vol. 4, 707:22-25.) Defendant stated she does not know who sent the e-mails. (*Id.* vol. 3, 477:2.) Plaintiffs argued at trial that "the evidence will show Sergeant Mucha was the one who was sending the harassing e-mails." (*Id.* vol. 1, 15:6-8.) In fact, Sergeant Randy Mucha ("Sergeant Mucha"), a former Oak Brook village police officer and friend of Defendant, admitted to sending at least one of these messages. (*Id.* vol. 3, 518:1-3.)

Plaintiffs believe, however, that Defendant Mullins is responsible for the alleged harassment as well. (*Id.* vol. 1, 15:11-13.) They contend that Defendant and Mr. Mucha began communicating by e-mail while Defendant "began pursuing an improper investigation of Fran and Casey Gaik." (*Id.*

2

vol. 1, 12:17-18.) Plaintiffs alleged that Defendant "looked up information about the Gaiks," including Dr. Gaik's educational credentials, professional licenses, and a past criminal complaint. (*Id.* at 12:23, 13:8-14, 24-25.) Defendant denied she ever "investigated" Plaintiffs; she acknowledged that she had looked up some information while waiting in line in the county courthouse in September 2004, but insists that she never used or communicated any of the information she uncovered. (*Id.* vol. 2, 349:2-5; vol. 3, 485:23; vol. 3, 437:19-21.) By March of 2005, both parties were receiving neighborhood mailings critical of the village administration, Defendant, or alternately the Oak Brook Citizens for Better Government group. (*Id.* vol. 3, 435:11-24.) At least one mailing from late March mentioned Plaintiffs Dr. Fran and Casey Gaik by name and contained personal accusations and criticism as well as statements that "[p]ublic records [about Plaintiffs Dr. Fran and Casey Gaik] can be found at the DuPage County Courthouse." (*Id.* at 436:14-15.) Defendant denied participating in any of these mailings. (*Id.* at 437:2-6.)

The disputes between Plaintiffs and Defendant culminated on the evening of March 16, 2005. After a contentious village meeting, in which both Defendant and Plaintiff Casey Gaik were in attendance, but neither spoke publicly, Mr. Gaik approached Defendant in a hallway, said a few words to her and then allegedly touched or grabbed her arm. (*Id.* vol. 1, 16:12-15.) Defendant stated that Mr. Gaik "grabbed both my arms" and "was holding me," (*Id.* vol. 3, 447:6-10); Mr. Gaik himself reported he had no recollection of the incident when police first questioned him weeks later. (*Id.* vol. 2, 181:16-18.) The incident was, however, recorded by video surveillance of the village administrative building. (*Id.* vol. 2, 138:21-24.) Sergeant Mucha was also present at the meeting but not during the incident. (*Id.* vol 3, 546:12-14.) Sergeant Mucha testified that he was the only officer present after the incident with experience accessing the village's surveillance video, and that he collected and preserved tape from two cameras that captured the incident. (*Id.* vol 3, 546:9-11, 19-22.)

3

Several weeks later, Defendant Mullins signed and filed a two-count criminal misdemeanor complaint against Mr. Gaik for battery and disorderly conduct. (*Id.* vol. 2, 302:22-23.) Mr. Joe Ruggiero is the deputy chief of the DuPage County state's attorney's office who supervises misdemeanor prosecutions and first prosecuted the battery; he testified that before Defendant could sign her misdemeanor complaint, the state's attorney's office consulted with Defendant, screening the alleged battery and disorderly conduct charge for prosecution as a felony, because the alleged battery happened in a public place and involved a village prosecutor. (*Id.* vol. 3, 415:14-20.) Ultimately, though, Mr. Ruggiero's office decided to prosecute the incident as a misdemeanor. (*Id.* at 415:21-25.)

On March 29, 2005, the state's attorney's office commenced misdemeanor proceedings against Mr. Gaik, which ultimately took over two years to resolve. (*Id.* vol. 2, 155:9-12.) During that time, Mr. Gaik, through his attorney, repeatedly asked the DuPage County state's attorney's office to dismiss the charges or defer to a special prosecutor. (*Id.* vol. 3, 393:12-15.) In a letter dated September 7, 2006, Mr. Gaik's attorney told Mr. Ruggiero that he believed the charges were part of a retaliation campaign and that Defendant's previous employment and contacts with the DuPage state's attorney's office could result in improper bias against Casey Gaik. (*Id.* vol. 2, 149:9-11, 150:1-7, 21-24, 151:1; Letter from Russo to Ruggiero of 9/7/06, Pl.'s Trial Ex. 5A.) Mr. Ruggiero declined to relinquish supervision of Mr. Gaik's prosecution, but later that month transferred the case to another prosecutor at the DuPage County office, Mr. Jeffery Muntz. (*Id.* vol. 3, 396:1-4.) Mr. Ruggiero testified, "It came to a point in time where I did not have time to deal with this case anymore as I had other trials to go to. So I just let the attorneys that were in the courtroom handle the case." (*Id.* at 395:6-9.)

On May 7, 2007, the day scheduled for Mr. Gaik's criminal trial, Mr. Muntz informed Mr. Gaik that the district attorney's office was dropping the charges against him. (*Id.* vol. 2, 154:7-12.) Mr. Muntz explained to the DuPage County court that his office had concluded "that the additional

evidence required was simply not there." (Transcript of Proceedings against Mr. Gaik, Joint Trial Ex. 2 at 4; Trial Tr. vol. 2, 155:22-23.)

Plaintiffs commenced the present civil action on April 20, 2005, shortly after Mr. Gaik was first charged, against the Village of Oak Brook, Sergeant Randy Mucha, and Defendant Joan Mullins. (*See* Compl. [1] at 1.) Plaintiffs settled with the village and Sergeant Mucha in September of 2006, leaving Ms. Mullins as sole Defendant. (Am. Compl. [117] ¶ 8.) After a five-day trial, the jury found Defendant not liable for malicious prosecution or depriving Plaintiffs of their civil rights. (Trial Tr. vol. 5, 923:1-23.) This motion for a new trial followed.

## **DISCUSSION**

Plaintiffs seek a new trial pursuant to Rule 59 of the Federal Rules of Civil Procedure. That Rule authorizes the court to set aside a jury's verdict and grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59(a)(1)(A).[1] The reasons for granting a new trial fall into two categories; either "the verdict is against the manifest weight of the evidence or a prejudicial error occurred." *Romero v. Cincinnati, Inc.,* 171 F.3d 1091, 1096 (7th Cir.1999) (citations omitted). Plaintiffs argue that three types of prejudicial errors resulted from the conduct of Defendant's counsel during trial: "Specifically, the Gaiks were prejudiced by [Defendant's] last-minute document production, misuse and misstatement of jury instructions during closing argument, and exploitation of the Court's evidentiary rulings regarding the [criminal record of Defendant's relative]." (Pl.'s Mot. at 1.)

The standard for setting aside a jury verdict because of alleged misstatements or misconduct by an attorney during trial is a high one. Rule 61 provides: "Unless justice requires

---

[1] Defendant has objected to the motion as untimely, but the court disagrees. Time for filing motions, including one for a new trial pursuant to FED. R. CIV. P. 59, is governed by Rule 6, which instructs the court to "exclude the day of the event" and "intermediate Saturdays and Sundays." FED. R. CIV. P. 6(a)(1)-(2). The court entered judgment on a Friday (Docket Entry 5/16/08 [198]), and Plaintiffs filed their motion ten weekdays later (Docket Entry 5/30/08 [199]). The motion is therefore timely.

otherwise, no error in admitting or excluding evidence--or any other error by the court or a party--is ground for granting a new trial. . . ." FED. R. CIV. P. 61. To order a new trial under this standard, the court must find both that attorney statements amounted to misconduct and that the misconduct prejudiced the moving party. *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008). As Plaintiffs point out, the court may consider the cumulative impact of irregularities or misstatements during trial in determining whether they were prejudicial. *Hillard v. Hargraves*, 197 F.R.D. 358, 361 (N.D. Ill. 2000) (*citing U.S. v. Williams*, 81 F.3d 1434 (7th Cir. 1996)). Considering each of Plaintiffs' allegations of misconduct below, the court finds that none resulted in prejudice justifying a new trial.

**I.      Reasonable Basis for the Jury's Verdict**

Plaintiffs have not challenged the sufficiency of the evidence to support the jury's verdict, (Pl.'s Mot. at 1), but in assessing their specific arguments, a summary of that evidence is useful. Plaintiffs' first claim was for malicious prosecution under Illinois law. In order to succeed on this claim, Plaintiffs must show by a preponderance of the evidence:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) **the absence of probable cause for such proceeding**; (4) the presence of malice; and (5) damages resulting to the plaintiff. . . . The absence of any one of these elements bars a plaintiff from pursuing the claim.

*Kunz v. DeFelice*, 538 F.3d 667, 681-82 (7th Cir. 2008) (emphasis added) (*quoting Swick v. Liautaud*, 169 Ill.2d 504, 512, 662 N.E.2d 1238, 1242 (1996)). The court instructed the jury on these elements. (Trial Tr. vol. 5, 904:16-26, 905:1-5.) In support of her claim that there was probable cause for prosecuting Mr. Gaik, Defendant offered the testimony of Mr. Ruggiero, the original prosecutor, and Detective George Peterson, the investigating officer. (*Id.* vol. 5, 846: 6-10.) After reviewing the security video, both Mr. Ruggiero and Detective Peterson believed there was probable cause to prosecute Mr. Gaik for misdemeanor battery and disorderly conduct. (*Id.* vol. 3, 405: 7-10; vol. 4, 634:22-25.) The testimony of these two witnesses provided a reasonable basis for the jury to reject Plaintiffs' malicious prosecution claim.

6

As to Plaintiffs' two claims under 42 U.S.C. § 1983, the jury could have reasonably concluded that Defendant did not cause any of the alleged harassment or resulting harms that Plaintiffs claimed. At trial, Plaintiffs sought to recover against Defendant for Mr. Gaik's criminal defense expenses, costs Plaintiffs allegedly incurred in moving from their home in Oak Brook, and the harm Plaintiffs allegedly suffered from being forced to withdraw from participation in their Oak Brook citizens' group. (*Id.* vol. 1, 20:15-24.) To establish liability under 42 U.S.C. § 1983, Plaintiffs must prove that the conduct complained of (1) was committed by a person acting under "color of state law" and (2) violated a constitutional right of the plaintiff. *Yang v. Hardin*, 37 F.3d 282, 284 (7th Cir. 1994); *Spencer* v. *Ill. Community Action Ass'n*, 51 Fed. Appx. 973, 975 (7th Cir. 2002) (citations omitted). Furthermore, Plaintiffs must prove that the Defendant herself caused their harms. *See Burks v. Raemisch*, 555 F.3d 592, 593-94 (7th Cir. 2009) (*citing Monell v. New York City Dep't of Social Services*, 436 U.S. 658 (1978)). Accordingly, the court instructed the jury that Plaintiffs had to prove by a preponderance of the evidence that Defendant herself, in an effort to harm Plaintiffs, caused Plaintiffs to either cease participating in their citizens group, incur costs in moving from Oak Brook, or incur costs in defending Mr. Gaik. (Jury Instructions 23, 24; Trial Tr. vol. 5, 903:20-25, 904:1-6.)

Defendant contested each of these claims of harm, arguing that she exerted no influence on Mr. Gaik's prosecution and was not the cause of Plaintiffs' decision to leave Oak Brook or to stop participating in their citizens' group. (Trial Tr. vol. 1, 51:14-22.) The court heard unrequited testimony from Sergeant Mucha and from Defendant, both stating that it was Sergeant Mucha and not Defendant who wrote the allegedly harassing e-mails to Plaintiffs. (*Id.* vol. 3, 477:2; 518:1-3.) Dr. Gaik herself testified that she resigned from her Oak Brook citizens' group and stopped attending meetings on March 8, 2005, several weeks prior to the village meeting encounter between Mr. Gaik and Defendant. (*Id.* vol. 4, 713:4-8.) When asked how Defendant influenced Plaintiffs' decision to leave Oak Brook, Mr. Gaik linked that decision to the charges; he testified,

7

"When your freedom, I guess, is effectively attacked and you are defending yourself on a criminal charge that has a one-year prison penalty, you tend to become very reluctant to go to sleep in your own home. It's very dangerous living there." (*Id.* vol. 2, 162:22-25, 163:1-2.)

The court heard no testimony that Defendant directed or condoned any actions by police or village officials that might have intimidated Plaintiffs or pressured them into moving out of town. Instead, Defendant testified that she would have taken the same actions, signing a complaint against Mr. Gaik for battery and disorderly conduct, regardless of Plaintiffs' participation in protected activities such as speaking out at village meetings. (*Id.* vol. 3, 494:14-18.) The state's attorney made the decision to proceed with prosecution, and as noted, there was evidence from which the jury could have found probable cause. In short, the jury had a reasonable basis for determining that Defendant had not caused any of Plaintiffs' alleged harms.

## II.  Defendant's Late Document Production

Plaintiffs argue that Defendant's late document production undermined their ability to present their case. (Pl.'s Mot. at 2.) The day before trial, Defendant produced a single document which Plaintiffs offered in evidence. (*Id.*) The document was a single e-mail exchange from Defendant to Sergeant Randy Mucha, dated February 9, 2005 and marked "page 1 of 3," and reading as follows:

> Re: Stuttley is publishing on Joan Mullins
>
> maybe we should take the high road and give all the benefit of the doubt and maybe people will start realizing the only thing to worry about is lies.

(E-mail from Mullins to Mucha of 2/09/05, Pl.'s Trial Ex. 83, Ex. A to Pl.'s Mot [202-2].) On direct examination by Plaintiffs' counsel at trial, Defendant explained that this e-mail communication related to the February 10th Oak Brook *Daily Herald* newspaper article mentioning Defendant's auto accident. (Trial Tr. vol. 3, 465:16-22.) Defendant stated, "There were so many lies and rumors going around. And my statement is that maybe everybody should just take the high road and not

react to the negative things being said. . . ." (*Id.* at 466:11-12.)

Plaintiffs allege that Defendant intentionally withheld this document until the eve of trial, redacted pages 2 and 3 before releasing them later during trial, and misrepresented to the court that Defendant had produced the document as part of Defendant's Rule 26.1 discovery disclosures. (Pl.'s Mot. at 3.) It is undisputed that Defendant produced pages 2 and 3 of the e-mail for Plaintiffs on the final day of trial; Plaintiffs explain that they have now lost these two additional pages, which neither party offered in evidence or read into the record. (Pl.'s Mot. at 3; *See* Letter from Hattendorf to Dang and Dolan of 5/21/08, Ex. D to Pl.'s Mot. [202-4].) In a hearing on this matter outside the jury's presence, Defendant's counsel explained that he thought the e-mail had been disclosed by Defendant's previous attorneys, who withdrew prior to trial. (Trial Tr. vol. 5, 779:10-17.) Counsel explained that Defendant "had documents with her original attorneys, the 26(a) disclosures, and that's where it's from. . . . I gave it to counsel as soon as I knew it was there." (*Id.*) As Plaintiffs point out, the e-mail was not in fact part of Defendant's original discovery disclosures. (*See* Def.'s 26.1 Disclosures, Ex. C to Pl.'s Mot. [202-3].) The court then heard argument on the late production of the e-mail chain, and its effect on the fairness of the proceeding:

> THE COURT: And what happened here, you are certainly welcome to tell the jury. I am asking, do you have evidence that [Defendant] deliberately concealed this?
>
> [PLAINTIFFS' COUNSEL]: Certainly not.
>
> THE COURT: I think that's -- to the extent such an argument would be made, you have to have evidence for it. Otherwise you are free to use this document.

(Trial Tr. vol. 5, 785:8-11.) Plaintiffs entered page 1 of the e-mail into evidence and questioned Defendant about its meaning, but not about its late production or any alleged concealment of it. (*Id.* vol. 3, 465:1-22.) Plaintiffs did, however, make reference to the e-mail's late production during closing statements, and now argue that Defendant's "improper objection" to that reference prejudiced the jury. (Pl.'s Mot. at 4.) Specifically, during closing, Plaintiffs' counsel showed the jury the e-mail and stated, "This was produced on the eve of trial, this document." (Trial Tr. vol. 3, 833:

20-21.) Defendant objected and the court, at sidebar, instructed Plaintiffs not to dwell on discovery. (*Id.* at 838:22-25, 839:15-16.)

In determining the impact of late document production on the fairness of the trial process, the court considers the materiality of the document, its use at trial, and the party's opportunity to review it. *See Spurgin-Dienst v. United States*, 359 F.3d 451, 457 (7th Cir. 2004) (finding the trial court did not abuse its discretion in denying a new trial after the defendant produced a document "in the middle of trial" because the plaintiffs still had "ample time to review it and decide whether to use it."). Here, although this single e-mail was produced right before trial, Plaintiffs had the opportunity to offer all three pages into evidence, consult with the court on the final day of trial, and question Defendant about the e-mail, including the initially missing pages. Plaintiffs accepted the court's resolution that they were "free to use this document," yet did not question Defendant on the late production or the initially missing pages, nor did they offer those final pages into evidence. By accepting the court's non-prejudicial arrangement to use or review a document produced during trial, Plaintiffs have waived their argument that the late production constitutes grounds for a new trial. *Spurgin-Dienst*, 359 F.3d at 457.

Indeed, Plaintiffs make no arguments about how their limited access to this e-mail could have prejudiced their case at trial. The message appears to be exculpatory, if anything; Plaintiffs do not explain how they might have more fully used a document in which Defendant talks briefly about "taking the high road" to support allegations that Defendant engaged in a campaign of harassment or retaliation.

Finally, Defendant's objection to Plaintiff's comment during closing argument cannot be considered prejudicial. The court had instructed the jury that an attorney's objections are not evidence, reminded them that they were not to be influenced by such objections, and cautioned them against inferring from any of the court's rulings what the outcome of the trial should be. (Trial Tr. vol. 5, 895:5-10.) These instructions mitigated any prejudice from improper attorney remarks or

objections, as the court presumes the jury has followed this instruction and made their decision based on the evidence at trial. *Soltys v. Costello*, 520 F.3d 737, 744 (7th Cir. 2008). The court therefore finds no prejudice resulted from Defendant's late document production.

### III. Defendant's Allegedly Misleading Summary of Jury Instructions

Plaintiffs next argue that Defendant misstated the law while summarizing a jury instruction during closing statements, resulting in juror confusion. (Pl.'s Mot at 5.) These allegations concern the jury instruction on the harms allegedly arising from Defendant's alleged violation of Plaintiffs' equal protection rights. The relevant portion of the jury instruction read as follows:

> To succeed on this claim, the Gaiks must prove several things by a preponderance of the evidence:
>
> . . .
>
> (4) Mrs. Mullins' actions caused harm to the Gaiks in *one or more* of the following ways:
>
> - they ceased participating in a citizens group in Oak Brook,
>
> - moved out of Oak Brook incurring costs and expenses in connection with that move; *or*
>
> - incurred costs and expenses, including attorney's fees, defending against the battery and disorderly conduct criminal charges.

[emphasis added] (Jury Instruction 23, Ex. F to Pl.'s Mot. [202-7].) During closing statements, before discussing the three counts against Defendant, Defendant's counsel stated: "The Court will instruct you that the Gaiks have to prove each -- each -- allegation. And I highlight that because sometimes it's not looked at careful enough, but each one has to be proven." (Trial Tr. vol. 5, 880:18-21.) Defendant's counsel displayed instructions for each count on an overhead system, eventually reaching Jury Instruction 23 and discussing the elements of Plaintiffs' equal protection claim. When Defendant's counsel reached sub-section four, on the alleged harms to Plaintiffs, Defendant's counsel stated:

11

> They also have to show they ceased participating in citizens groups in Oak Brook. The reason Mr. Kennedy came in today was to dispute that very fact, that Fran Gaik is in a citizens group. She is still dealing with the Fullersburg Woods association in Oak Brook and participated in a meeting with Quinlan after she filed this lawsuit.
>
> Again, if you find that they did not prove any of these – you could just pick one – then you find for Ms. Mullins.

(*Id.* at 881:23–882:6.) Plaintiffs did not object to these statements. (*Id.*)

Plaintiffs contend that Defendant misstated the law, leading the jury to believe that Plaintiffs had to prove they suffered *each* of the alleged harms in sub-section four, as opposed to *each* element on their equal protection claim. During deliberations, the jury passed a note to the court about instruction 23. The note read: "on #22/23 how many bullets have to be no for Mullins." (Juror Note, Ex. G to Pl.'s Mot. [202-8].) After meeting with Plaintiffs and Defendant, the court decided the language in the instructions was clear and advised the jury to simply re-read them and continue deliberating. (Trial Tr. vol. 5, 921:20-24.) The jury returned a verdict less than an hour later, with no further questions for the court. (*Id.* at 922:14-15.)

Defendant's comments on jury instruction 23 are arguably ambiguous, even characterizing them as a misstatement, however, "improper comments during closing argument rarely rise to the level of reversible error." *Lewis v. City of Chicago*, 563 F. Supp. 2d 905, 922 (N.D. Ill. 2008) (*quoting Doe by and through G.S. v. Johnson*, 52 F.3d 1448, 1465 (7th Cir. 1995)). First, by failing to object during Defendant's remarks on the jury instruction, Plaintiffs have waived their right to challenge the jury's verdict on this ground. *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). Plaintiffs correctly point out that where the issue is preserved by objection, misstatements in a closing may warrant a new trial when the improper comments have "influenced the jury in such a way that substantial prejudice resulted to the opposing party." *Mayall v. Peabody Coal Co.* 7 F.3d 570, 573 (7th Cir. 1993) (citations omitted) (finding a new trial was not warranted for attorney misstatement of law because jury instructions and weight of the evidence were clear). In this case, however, even if Plaintiffs had properly objected and could show that Defendant had clearly

misstated the law, any prejudice was mitigated by the court's instructions that closing statements are not evidence and not controlling. (Trial Tr. vol. 5, 895:5-10.) *See Mayall*, 7 F.3d at 573 (finding the same). The court "presumes that juries follow the instructions given them by the court." *Soltys*, 520 F.3d at 744. The court believed the language of jury instruction 23 to be clear, that the jurors could follow it without further clarifications, and that they did so.

Plaintiffs argue that because Defendant displayed and highlighted the court's actual jury instruction during closing statements, those statements "rose above a mere misstatement of law" by confusing the jury over whether Defendant was giving the court-sanctioned explanation of those instructions. (Pl.'s Mot. at 5.) Again, the court instructed the jury to the contrary, and this is not a case where the instructions themselves were unclear. If they had been, and if Plaintiffs had made a timely objection, the court would "consider the instructions as a whole, along with all of the evidence and arguments, to determine whether the jury was misinformed about the applicable law." *U.S. v. White*, 443 F.3d 582, 589-89 (7th Cir. 2006) (citations omitted). Instruction 23 explained that Plaintiffs needed to show that Defendant's "actions caused harm to the Gaiks in *one or more* of the following ways. . . ." (Jury Instruction 23, Ex. F to Pl.'s Mot., emphasis supplied.) The court concludes that Defendant's arguably-inaccurate closing statement and simultaneous display of the accurate instruction did not prejudice Plaintiff.

## IV. Defendant's Allegedly Improper Remarks in Violation of the Court's Evidentiary Ruling

Lastly, Plaintiffs argue that in his opening statement, defense counsel prejudicially referred to Plaintiffs as having "attacked" Defendant's family. (Pl.'s Mot. at 6.) Plaintiffs believe these comments unfairly side-stepped the court's ruling on Defendant's motion *in limine* barring mention of the criminal driving arrest of one of Defendant's relatives. As a result, Plaintiffs argue, they were unable to rebut or explain Defendant's allegation that they had "attacked" Defendant's family. (Pl.'s Mot. at 6.) Plaintiffs do not challenge the motion *in limine* itself, which the court granted, barring any

13

mention of the 2003 DUI arrest of one of Defendant's relatives. (*See* 2/22/08 Tr. 65:3-67:6.) In 2005, Plaintiffs had voiced criticism of the village's response to this DUI as well as to Defendant's own February 2005 auto accident. (Pl.'s Mot. at 6; Feb. 10th Oak Brook *Daily Herald* article quoting Dr. Gaik, Pl.'s Tr. Ex. 41, Ex. I to Pl.'s Mot. [202-9].) Defendant contended that her relative's DUI was not relevant because, although there is evidence that she had expressed frustration about Plaintiffs' attacks on her family, she was not referring to the 2003 incident. (2/22/08 Tr. at 67.) The court agreed and granted Defendant's motion *in limine* barring reference to the DUI.

Plaintiffs now argue that Defendant took unfair advantage of the court's *in limine* ruling by alluding to "attacks" Plaintiffs had made on Defendant's family. Plaintiffs point to Defendant's opening statement, where Defendant stated that witness Jeff Kennedy, who was involved in a homeowners association with Plaintiffs, "will come in here and say that in these meetings Fran Gaik began to bring up the Mullins family, for whatever reason, and attacked the Mullinses." (Trial Tr. vol. 1, 36:9-11.) In those opening statements, Defendant also stated "[Defendant's] search on the computer was in 2004 when the Gaiks started going after the Mullins family." (*Id.* at 37:1-2.) And additionally: "There's all kinds of comments about the Mullins family that will come out in this case." (*Id.* at 54:10-11.) Plaintiffs failed to object to these statement, but they now argue that they were not supported in the evidence, because Defendant could "only describe[] the secondary effects of the rumor mill," and not any specific attacks Plaintiffs had directed at Defendant's family. (*See Id.* vol. 2, 341:14-17; Pl.'s Mot. at 8-9.) Plaintiffs did, however, object when Defendant asked witness Jeff Kennedy whether a homeowners group that included Dr. Gaik had discussed Defendant's family at a meeting. (Pl.'s Mot. at 8-9.) The court sustained that objection and instructed the jury that the statements were not admissible. (Trial Tr. vol. 5, 802:9-18.) Plaintiffs concede that, outside of these references to attacks on her family, Defendant never mentioned the subject of her motion *in limine*, the criminal driving arrest of her relative, or the Plaintiffs' criticism of the handling of that incident. (Pl.'s Mot. at 9.)

In their own opening statements, Plaintiffs referred to an e-mail to Sergeant Mucha in which, commenting on the 2005 Oak Brook *Daily Herald* article, Defendant wrote, "But when push comes to shove and if they continue attacking my family I will not back down." (E-mail from Mullins to Mucha of 2/11/05, Trial Ex. 43, Ex. J to Pl.'s Mot. [202-11]; Trial Tr. vol. 1, 12:11-13.) Defendant now argues that her own opening remarks sought to explain why she felt her family was under attack without mentioning the incident barred by Defendant's motion *in limine*. (Def.'s Resp. at 13.) Defendant did so in testimony at trial, stating, "When my family and my name and my character and my reputation gets dragged through the mud and it affects my children, I think that's attacking me and my family and my kids." (Trial Tr. vol. 2, 341:14-17.)

As with their concerns about Defendant's closing, Plaintiffs' failure to object to Defendant's opening statements constitutes a waiver of this argument. *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008). In any case, an opening statement is not evidence, but is instead a statement about what the attorney reasonably believes the jury will hear. *See Testa v. Village of Mundelein*, 89 F.3d 443, 446 (7th Cir. 1996). The court instructed the jury on this point, reminding them that "[i]f the evidence as you remember it differs from what the lawyer said, your memory is what counts." (Trial Tr. vol. 5, 895:11-15.) These instructions substantially mitigate any potential prejudice from an attorney's opening or closing statements. *Soltys*, 520 F.3d at 744. The jury heard direct evidence as to Defendant's views about Plaintiffs' attack on her family; the court presumes that the jury followed instructions and considered only this evidence. *Id.* Thus, even had Plaintiffs properly objected, Defendant's opening remarks would not amount to misconduct resulting in prejudice to Plaintiffs.

As to Defendant's questioning of witness Jeff Kennedy, the court sustained Plaintiffs' objection and the witness' testimony put no prejudicial information before the jury. Plaintiff cites *Long v. Cottrell, Inc.*, 265 F.3d 663, 667 (8th Cir. 2001) ("Improper questions that place prejudicial information before the jury may entitle the aggrieved party to a new trial."). In *Long*, the court

affirmed the district court's denial of a new trial after an improper line of questioning with no curative instruction, since "questions before the jury were minimal, and it occurred on the first of a five day trial." *Long*, 265 F.2d at 667. Defendant's questioning in this case did not even go this far; when Defendant asked Mr. Kennedy about a discussion at a homeowners meeting, Mr. Kennedy replied, "You know, it's -- I can remember what the Fullersburg group said -- O'Malley, Vescovi, Allison, Dr. Fortran, Fran Gaik, and others. It's hard for me to say this person said that, in terms of what happened in those meetings." (Trial Tr. vol. 5, 801:25, 802:1-4.) The court sustained Plaintiffs' objection before the witness could give any more answers (Trial Tr. vol. 5, 802:9-18), and later instructed the jury that an attorney's questions are not evidence. (*Id.* vol. 5, 895:5-10.)

Other authorities Plaintiffs cite stand only for the proposition that prejudicial questioning or attorney comments may entitle the adversely-affected party to a new trial: *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir. 1983); *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 211-12 (3d Cir. 1992). This court concludes that Defendant's questions did not prejudice Plaintiffs, and that they are not entitled to a new trial on this ground.[2]

## **CONCLUSION**

. Plaintiffs' motion for a new trial [202] is denied.

ENTER:

Dated: July 30, 2009

_____
REBECCA R. PALLMEYER
United States District Judge

---

[2] In brief footnotes, Plaintiffs also argue that they were prejudiced when Defendant repeatedly referenced Plaintiffs' appearance on a daytime television talk show. (Pl.'s Mot. at 6, n. 2; *See* Trial Tr. vol. 1, 39:3-4; vol. 2, 235:12; vol. 5, 867:1-2.) Plaintiffs also claim prejudice when Defendant "functionally recanted" the Parties' stipulation on damages during closing statements by stating, "There is no agreement at all between us and the Gaiks on anything." (Pl.'s Mot at 6, n. 3; *See* Trial Tr. vol. 5, 867:24–868:4.) Again, Plaintiffs have waived their objection to these statements by failing to object at trial. *Soltys*, 520 F.3d at 745.